(No. 81487.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES McLAURIN, Appellant.

*Opinion filed September 24, 1998.—Rehearing denied November 30, 1998.*

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Renee Goldfarb and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

In the circuit court of Cook County, a jury found the defendant, Charles McLaurin, guilty of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)), first degree murder based on the felony-murder doctrine (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)), home invasion

(Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(2)), aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1), residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3(a)), and possession of a stolen motor vehicle (Ill. Rev. Stat. 1989, ch. 95$\frac{1}{2}$, par. 4—103(a)(1)). At the phase of the trial in which his guilt was determined, defendant represented himself, and the trial court appointed the public defender as standby counsel. However, at the sentencing hearing the public defender represented him. Defendant waived his right to a jury for sentencing. The trial court found him eligible for a death sentence and thereafter, upon consideration of aggravating and mitigating circumstances, determined that there were no mitigating circumstances sufficient to preclude the imposition of a death sentence. The trial court sentenced him to death for the offense of first degree murder; to a term of 60 years for the offense of home invasion; to a term of 30 years for the offense of aggravated arson; to a term of 15 years for the offense of residential burglary; and to a term of 7 years for the offense of possession of a stolen motor vehicle, all to be served concurrently. The trial court denied defendant's motion for a new trial as well as his post-sentencing motion. Defendant's execution has been stayed pending direct review of the cause by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603. He presents 15 issues for our review.

Initially, defendant contends that the State failed to prove his guilt beyond a reasonable doubt. Janie Edwards, the mother of the 17-year-old victim, Jarrell Edwards, testified for the State that on the weekend of August 15, 1992, she was away on a trip, having left Jarrell and his father at home. She called and spoke with Jarrell at about 11 p.m. on Saturday, August 15. She indicated that his bedroom was located in a front corner of the house, which was nearly destroyed by fire during her absence. Among the items missing from her home

upon her return were two VCR's, two 13-inch television sets, some jewelry, a 12-gauge shotgun, Jarrell's clothing, including his gym shoes, and a blue 1987 Chevrolet Celebrity automobile. She testified that she always keeps her grandmother's Bible open on the dashboard of her car and that the weather stripping at the driver's window of the Chevrolet had fallen down. The license plate number of the Chevrolet was 32715, handicapped. Although she had left the keys to that automobile at home, she never recovered them.

Rodchester Rogers testified that he and Janie Edwards had two children, including the victim, and that on the evening of August 15, 1992, the witness had gone out with friends and had not returned until about 5 a.m. on Sunday, August 16, 1992. He stated further that in August of 1992 he kept two gasoline cans in the garage for the lawn mower. Although one can had a hole in it and was empty, the other had gas in it. A set of keys to the house and the car were kept in the family room.

Keith Damm, a firefighter for the Sauk Village fire department at the time, testified that, following a dispatch to a fire call at about 3 a.m. on August 16, 1992, and a search of the house, his partner informed him that he had found a body. The body of the victim was found lying face down about three or four feet inside the door of the room farthest down the hall on the right, where the heat of the fire was the most intense. Damm found debris around the body and furniture lying over its legs. He and his partner carried the body from the room, finding when they attempted to lift it that it was stuck to the floor because "[e]ither the carpeting on the floor had burned to him or he had burned to the carpeting." The victim was wearing no clothing. A piece of cloth was wrapped around the victim's head, covering his nose.

Ed Myers, the captain of engineering and "cause and origin investigator" of the Sauk Village fire department,

testified that he arrived at the scene of the fire at about 3:16 a.m. on August 16, 1992. When the unclad victim was removed from the house, he noticed "some type of bandanna [sic] headdress around his face" in the area of the nose and mouth. At the top of the stairs he observed a rubber-like glove, like a surgical glove; the fire department did not use these kinds of gloves. In the hallway was a distinct pattern of flammable liquid having been spread on the floor; the burn pattern came out of the bedroom and led down the hallway. In the room where the victim was found, which was "totally destroyed," he said, they picked up a pile of clothes and smelled gasoline. About a foot inside the doorway of that room there was heavy charring and burning down to the floor and even to the subflooring in the area "where the liquid *** seeped through the hardwood floor into the sub-flooring." About three feet into the room where the victim was found was a large area of blood-soaked carpeting. On the floor of the bedroom as one entered was a gasoline can that had been there during the fire, as evidenced by the damage to the can. Because the can had vented itself, some liquid had been left inside it. The burn patterns and the charring indicated to the witness that a flammable liquid had been used in the area; the fire was, he said, "very fast," indicative of a gasoline pour. In his opinion persons unknown had entered the dwelling, poured a flammable liquid on the victim and the bedroom flooring, spread it down the hallway, and ignited it.

Delshea Ingram, 26 years old at the time of trial in November of 1995, testified that she had met the defendant in June of 1992 and had married him on July 16, 1992. We note that although prior to trial defendant had asserted the protection of the marital privilege with respect to certain statements he had made to Ingram and had claimed that the marital privilege had been deliberately violated in the return of the grand jury indictment,

during trial he denied ever having been married to Ingram; in his brief to this court he describes Ingram as "either Mr. McLaurin's wife or girlfriend" and argues that her testimony that they were married on July 16, 1992, when defendant "paid someone outside of the building [City Hall] to marry [them]" and her testimony that defendant used the name "James Antonio Thorpe" when they were married "shows that she was lying or deluded." At trial Ingram gave the following account of events that occurred on August 15 and 16, 1992, and during the weeks and months thereafter.

While Ingram was at the park during the day on August 15, 1992, the victim, whom she had never met before, flirted with her and talked to her for 15 or 20 minutes, telling her about and inviting her to a party he was planning to have while his parents were out of town. At about 9 p.m. that same day the witness told Carolyn McLaurin, defendant's sister, that she was leaving to go to the store to buy cigarettes but went, instead, to Jarrell Edwards' house about a block and a half away. When she arrived at his house, he was not there but drove up shortly thereafter in a two-door blue Oldsmobile or Chevrolet. After remaining on the porch with him for about 15 or 20 minutes, she asked him for a glass of water with which to take her medication for asthma. After about 10 more minutes, she asked if she could use his bathroom, whereupon he took her upstairs and showed her where it was. They talked a little while longer on the porch before she returned home.

Later a young man whom Ingram did not know and whose identity she never learned came to see defendant at the house of Carolyn McLaurin, with whom defendant and Ingram as well a number of other persons were living. Ingram, defendant, and the young man were in the kitchen, where they talked about robbing Jarrell Edwards' house because his parents were out of town. The

three of them wanted to rob the Edwards' house, she said, in order to obtain money to enable her and defendant to move from Carolyn McLaurin's. The three planned that she would go into the Edwards' house and leave the door unlocked. Defendant and the young man left about 15 minutes before she walked to the victim's house. Although defendant and the young man drove to the Edwards' house, she walked, as she explained, "because *** they said that Jarrell would think something was up, if he seen me with the both of them."

When she rang the Edwards' doorbell "[s]ome time after midnight," the victim let her in. No one else was there. She and the victim went to his bedroom and sat on his bed talking for about 15 or 20 minutes. Then she asked to use the bathroom because she was "stalling" for time and stayed in the bathroom about 5 or 10 minutes. When she emerged from the bathroom, which was upstairs, she saw the light go out in the victim's bedroom and in the basement, and defendant told her to get out of the house. Defendant's voice came from the victim's bedroom. Defendant's friend "grabbed" her, led her to the victim's bedroom, and put the light on, at which time she saw the victim "sitting on a wooden chair with his hands tied behind his back with no clothes on with a scarf—tied around his mouth." Defendant was in the room and walked in front of the victim, asking him whether he would go to the police if defendant let him go. Ingram testified, "I don't think Jarrell understood what he said because he said yes," whereupon defendant reached into his pocket and pulled out a straight razor, swung it, and struck the victim on the chest several times. The victim was "squirming," and Ingram saw blood coming from his chest. Then defendant "took whatever it was tied" around the victim's mouth and asked if he had any last words. According to the witness, "Jarrell said whatever you want, I'll give you; don't kill me, please

just don't kill me." Defendant put the scarf around the victim's mouth again and doused him with gasoline, which he got "[f]rom the corner." She described a gasoline can as being located between the door and a desk and said that she had not seen the gasoline can in the bedroom when she had been there earlier. The gasoline splashed on the upper part of the victim's body. Then defendant took a match from his pocket and set the victim on fire. Ingram noticed that while this was occurring, defendant wore surgical gloves, which he had not had on at Carolyn McLaurin's house. Ingram then ran down the hallway and out the front door, returning to Carolyn McLaurin's house without calling the police, an ambulance, or anyone.

Ingram saw defendant the next morning between 10 and 11 a.m. sleeping on the couch in the front room. When he awakened, she told him that his hair was singed. Defendant told her that if anyone ever found out what happened to the victim, he would kill her, her three children, and her mother. He then went into the bathroom and cut his hair.

Two days later defendant's mother called a "family meeting" at Carla McLaurin's house in Chicago Heights, as a result of which Ingram and defendant moved to his grandmother's house by Altgeld Gardens in Chicago. Ingram said she and defendant moved there "because [they] were running" and remained there for two weeks. Then defendant's mother provided him with a single bus ticket to Minneapolis. However, defendant refused to leave without Ingram because he had "let too many skeletons out [sic] the closet." After defendant's mother purchased another bus ticket so that Ingram could accompany him, in mid-September Ingram and defendant moved to Minneapolis. The entire time they were there defendant used the name of James Antonio Thorp, which also appears in the record spelled as "Thorpe." For the

sake of consistency we use the spelling "Thorpe." The witness used the name of Delshea Ingram Thorpe. While they were in Minneapolis, they applied for and received public aid. On January 12, 1993, she and defendant argued, defendant threatened her, and she went to the police in Minneapolis, telling them about a murder that had occurred in Sauk Village. She testified that at that time she did not tell the police the whole truth about what had happened "[b]ecause I was scared and I didn't want to let them know that I was involved." Nor, she testified, did she tell the entire truth to the grand jury in Cook County; she was, she said, still protecting herself and concealing what she had done. About a year after having been moved to El Paso, Texas, by the State's Attorney's office, Ingram was charged with first degree murder in the death of Jarrell Edwards. Her agreement with the State's Attorney's office, she stated, was for her truthful testimony concerning what happened on the night of Jarrell Edwards' murder in exchange for a prison term of 20 years following her plea of guilty to that offense.

On cross-examination she admitted that she had not told the grand jury that she had been in "the house" the night of Edwards' murder and stated that she had told the grand jury "part of the truth." She stated that she had been to the home of Carla McLaurin with defendant one time.

Dr. Edmond Donoghue, a physician and forensic pathologist, who is the chief medical examiner for Cook County, testified concerning the report of the postmortem examination prepared in the case of Jarrell Edwards by Dr. Konacki, a forensic pathologist in that office who had since retired and was living in Thailand and Turkey. The witness stated that the body was unclothed, except for a black scarf that was wrapped around the face and over the nose and secured in the back by a knot.

On the body were five incised, or slash, wounds, that is, wounds made with a sharp-edged instrument: a superficial incised wound about 10 inches long on the right upper chest and the upper abdomen; another such wound about four to five inches long on the front of the neck and the right upper chest; an incised wound about three inches long on the right side of the neck; a slanting incised wound about two inches long on the left cheek; and a very deep incision about two and a half inches long on the chin, extending from the right to the left side. The large amount of soot present in each of the incised wounds indicated that the wounds existed before the fire started.

Dr. Donoghue testified further that the most important internal evidence of injury occurred when Dr. Konacki examined the larynx and trachea of the body. When Dr. Konacki made an incision on the back surface of the larynx and the trachea and opened it up, he had the photographer take a picture, which shows large black strands of carbon particles, or soot. The large black strands indicate that the victim was alive at the time the fire started and that he had actually inhaled smoke into his larynx and trachea and into his lungs. Moreover, chemical tests for the presence of carbon monoxide and cyanide performed upon the victim's blood support the conclusion that the victim was alive when the fire started. The carbon monoxide level of the victim's blood was 23%, so that nearly one-fourth of the body's hemoglobin was bound to the carbon monoxide and, therefore, unavailable for use in transporting oxygen. Also present in the victim's blood was a low level of cyanide, generated as a by-product when plastics burn, as during a house fire when there is plastic in the house.

Dr. Donoghue testified further that the victim's body was burned severely essentially over about 100% of its surface. The burns were third-degree with charring and

splitting of the skin. The burns that the witness viewed in the photographs of the victim and reviewed in the report were consistent with a person's having had gasoline on his or her body and then having been set afire. Dr. Donoghue said that persons who are set on fire usually die of carbon monoxide poisoning and that, even though this victim sustained burns and was alive at the time the fire started, a likely cause of death here is carbon monoxide intoxication as a result of the inhalation of smoke. In the opinion of Dr. Donoghue, the manner of death of the victim was homicide, an opinion formed, he said, "because of the *** multiple incised wounds that were on the body, the scarf that was wrapped around the face and the fact that the police reports indicated that there was a can of gasoline in the room where he was found." On cross-examination Dr. Donoghue testified that a liquid accelerant is a very likely cause of third-degree burns because a very hot flame is applied to the surface of the body. He indicated that in the case of a body burned over 100% of its surfaces, it would be unlikely that one would be able to determine whether the victim had been bound at the wrists or ankles, for example; if the bindings have been burned off, there might be no way to tell that the victim had been bound. He said that a razor can make only one type of wound: an incised wound.

George Dabdoub, a specialist in trace chemistry analysis at the Illinois State Police crime laboratory, testified that he has a specialty in arson analysis involving the recovery of accelerant materials or hydrocarbons from debris samples. In the opinion of the witness all of the four samples he tested, including burnt cloth and burnt carpeting, contained the accelerant gasoline.

Debra Brunsberg of Minneapolis, Minnesota, a principal financial worker for Hennepin County Economic Assistance, that is, the public aid or welfare

department, identified a number of exhibits, including a copy of the combined application completed by Delshea Thorpe dated September 20, 1992, and by James Thorpe, dated September 21, 1992, as well as a copy of a receipt of an application for a Minnesota identification card completed by Delshea Ingram and a copy of a receipt of an application requesting a Minnesota identification card signed by James Antonio Thorpe, dated September 28, 1992. Notes on the combined application completed by Delshea Thorpe indicate, among other things, that "this person has been in Minnesota for one day." Brunsberg described the signature on the combined application completed by James Thorpe by saying, "It appears that the person originally wrote Charles M., crossed it out, and wrote James Thorpe." She testified that notes from the intake worker on the same form indicate that "this person is not on our county system, *** this is a married couple, and they have been in Minnesota one day from Chicago." Brunsberg also identified a certification letter from the State of Minnesota Department of Public Safety, attached to which is a copy of the application requesting a Minnesota identification card completed by James Antonio Thorpe, referred to above, as well as a certification letter from the State of Minnesota Department of Public Safety, attached to which is a copy of the actual Minnesota identification card that was issued to James Antonio Thorpe, bearing a photograph.

Hayden Baldwin, a crime scene supervisor for the Illinois State Police, testified that on August 17, 1992, he was called to process a vehicle at the Sauk Village public works garage, namely, a blue 1987 Chevrolet Celebrity bearing the license plate numbered 32715 and carrying a handicapped designation. He noted the fact that the ignition system had not been bypassed or broken, so that a key was necessary to start the vehicle. The ignition column was not damaged in any way, and there was no sign

whatever of forced entry into the vehicle. The witness found no latent fingerprints suitable for collection on the interior of the vehicle.

Carla McLaurin, defendant's sister, testified for the State that in August of 1992 she lived in Chicago Heights and that prior to August 16, 1992, defendant had been to her home there "[m]aybe once or twice" and Delshea Ingram had been there "about once." In the morning on "August 16, or August 17, 1992," she said, her children found a television on her enclosed back porch. When she looked on her back porch, she found two 13-inch televisions and two VCR's. The witness then asked a girlfriend if she would like to purchase a television. Later in the day Carla McLaurin left her apartment, but when she returned that night the two televisions and the two VCR's were no longer on the porch, and she never saw them again.

Venita Hollins, a friend of Carla McLaurin, testified that in the morning on August 16, 1992, a Sunday, Carla McLaurin called her and told her there were two televisions and two VCR's on her back porch and asked Hollins whether she wanted to buy a television or a VCR. Hollins said that she agreed to buy a television and a VCR from Carla McLaurin but never did so.

Donna Bankston testified that while on routine patrol for the Ford Heights police department between 8:30 and 9 a.m. on August 16, 1992, she stopped for a red light at an intersection and observed a blue, two-door Chevrolet Celebrity also stopped at the red light. Her attention was drawn to this vehicle, which was facing hers, because of its obstructed windshield and weather stripping hanging on the outside of the vehicle on the driver's side. The windshield was obstructed by a "book opened up sitting in the front on the dashboard." She noticed that the driver of the car "appeared to be nervous": "He had his hands on the steering wheel. He stared at me. I looked at

him. He grabbed the steering wheel and moved his hands back and forth along the steering wheel." She estimated that she and the defendant stared at one another for "[a]pproximately a minute." After she had driven about half a block further, she heard a radio dispatch from the Sauk Village police department stating that "they were looking for a blue two-door Chevy Celebrity with a male black driving the vehicle." About 30 minutes later she found the vehicle parked in the parking lot at the rear of an apartment complex. No one was in or near the car. She recognized the car by the obstructed windshield and the weather stripping hanging on the outside. She determined that the engine of the car was still warm and notified the Sauk Village police department over the radio that she had recovered the vehicle they were seeking. Advised that a tow truck would be sent for the vehicle, she waited until 1 p.m. when it arrived. Later that day she viewed a photo lineup at the Sauk Village police department and identified defendant as the person who had been driving the car. Ford Heights is located next to Chicago Heights. On cross-examination she denied ever having given a different account of these events. With the testimony of this witness the State completed its case in chief.

Defendant called 18 witnesses in addition to himself, among them William Crafton, who at the time of trial was chief of the Sauk Village police department. He testified that at about 1 p.m. on that date he received information regarding the automobile in question and secured it. Officer Bankston was one of the officers present when he arrived at the scene where the vehicle was parked. He stated that Officer Bankston had told him that she had seen the vehicle between 8:30 and 9:30 a.m. on that date with a male black driver whom she could identify. He testified further that Officer Bankston said she had noticed the vehicle because it was traveling at a high

rate of speed. She also noticed the vehicle, he said, because of "the book on the dashboard and the hanging weather stripping on the driver's side door." He did not recall that she had told him that at a stop light she had stopped near the driver of the vehicle. He testified that Officer Bankston had told him that she had not stopped the vehicle or pursued it because it was "speeding away" and she was unable to "catch up." He testified further that Officer Bankston had said that she had activated her lights and had attempted to stop the car. When he had instructed the dispatcher to enter information concerning the stolen automobile into the computer system LEADS at about 7 a.m. on August 16, 1992, he said, he had provided no information concerning the driver of the automobile. He said that he next saw Officer Bankston on August 19, 1992, on which date he showed her five photographs of black male subjects he had selected. Ford Heights is located next to Sauk Village. On cross-examination by the State the witness testified that he had not been writing down what Officer Bankston told him and that she had come up to him and was giving him information while he was looking into the vehicle as he secured it.

James Wallace, an inmate at the Cook County jail, testified that while he had been riding to court on a bus with Delshea Ingram, she had indicated to him that she was going to court because she had killed a man who had fondled her child.

Brian Lesniak, employed by the Sauk Village police department, testified on direct examination that while patrolling on August 16, 1992, he smelled smoke and saw it coming from the house in question. He told his dispatcher to notify the fire department and attempted without success to get the attention of anyone who might be in the house. On cross-examination the witness testified that he found a surgical glove on the stairs going up to the kitchen of the house.

Carolyn McLaurin, defendant's sister, testified that on August 16, 1992, she was at home with several other people, including defendant and his girlfriend, drinking and watching movies rented by defendant. She said that she was up "[f]rom that morning until, oh, maybe about 4:00 or 5:00 o'clock that next morning" and that defendant's girlfriend was sick that day. On August 16, 1992, "the same night," she said, no one left the house other than to rent movies, except Ingram, who went to get cigarettes. She testified that a "little fellow came by," whose name the witness could not remember, and was talking with Ingram. On cross-examination she testified that defendant and Ingram had stopped living with her at the end of August or the beginning of September.

In response to the State's initial questions upon cross-examination, Carolyn McLaurin testified that she had taken no medication, used no drugs, and consumed no alcohol that day and was not under the influence of any medication, drugs, or alcohol. After she had concluded her testimony and outside the presence of the jury, the trial court made the following statement:

"I want the record to reflect that the and that [sic] is putting on the record sua sponte, my obvservation [sic] of Carolyn McLaurin. The initial questions on cross-examination by the State's Attorney were with respect to had she been drinking. Had she used drugs. Was she on medication. My observations of this witness were that she appeared to me, to be slurring her words and nodding her head and her eyes were droopy. I don't know. I have never seen this woman before.

I think there was just reason and good cause for the State's Attorney to make those inquiries so that the jury could either learn that she had had some medication or had possibly used some well medication or drugs, whatever they were prescription or otherwise or had be [sic] drinking. The witness laid that to rest. And said that she had not. And I think that the questions were proper in that vein to put to rest any questions that the jurors may have. I am sure they made the same observations that I did.

The jurors may have had those inquiries I believe were proper under the circumstances."

Defendant called as a witness Officer Bankston, who testified that she had viewed the photo array on August 19, 1992, and that she had not told William Crafton that her attention was drawn to the 1987 Chevrolet Celebrity because it was speeding.

Defendant called again as a witness William Crafton, who testified that he recalled seeing in the family room on the lower level of the house a basket containing rubber gloves like the glove found "[a]t the door."

Defendant called as a witness Delshea Ingram, who testified concerning inconsistencies between her testimony at trial and the numerous statements she had made prior to trial. In her statement to police in Minneapolis she indicated that she had been at the Edwards' house but had not been in it, although thereafter in statements made prior to trial she admitted to having been in the house. Prior to trial she had told an assistant State's Attorney that defendant had driven her to the Edwards' house in the afternoon. On direct examination she admitted that in statements made prior to trial she had not said that she had seen blood coming from the victim's chest, that the gasoline can was "already" in the bedroom, and that defendant had been wearing surgical gloves; however, on cross-examination by the State she testified that in a statement to an assistant State's Attorney prior to trial she had said that she had seen the defendant take a pearl-handled straight razor from his jacket pocket and begin slashing the victim's chest and that the victim was screaming. In the same signed statement she had said that defendant had taken a can of gas and had begun to pour it on the victim. In that statement she had also said, "I think the other guy was taking the stuff out of the house when Charles McLaurin was pouring the gas on Jarrell." On cross-examination she stated that she had told the police in Minneapolis

and had said in subsequent statements made prior to trial, including her testimony before the grand jury, that Charles McLaurin had killed Jarrell Edwards but that she had tried to protect herself when she talked to the police in Minneapolis and when she had made most of the subsequent statements prior to trial. On direct examination she admitted that the prosecution had offered her a term of 20 years, a "total of ten years"; on cross-examination she testified that the following week she was going to plead guilty to the murder of Jarrell Edwards and be sentenced to a term of 20 years and that, like any other prisoner, if she "behave[d]" in prison, she might receive day-for-day good time.

Joseph Kosman, an assistant State's Attorney, testified that he had questioned Ingram before the grand jury and that she had testified there that as she left the bathroom, a voice she recognized as her husband's told her to get out of the house. Kosman stated further that before the grand jury Ingram had testified that after she had left the Edwards' house and while she was outside walking toward the next house, she had heard Jarrell Edwards scream, "Take what you want. Take what you want. Please don't kill me. Just don't kill me," or words to that effect.

Defendant testified in his own behalf, denying having left Carolyn McLaurin's home on the evening in question and having gone "to someone else's home with Miss Ingram." On cross-examination he admitted that after he had entered the "shelter home" in Minnesota he had become known as James Antonio Thorpe, explaining that he had used the new name because "there were people that I grew up with in Altgeld Gardens where I went to high school that I really didn't want to be around. And since it was a long period of time from the time that they had last seen me, I figured, well, if I use a name, then if I really didn't want to be bothered with them, I would tell them, you have got me confused with someone else." He

indicated that he had used the new name because of the "bad influence, bad people from Altgeld Gardens that were living in this area in Minneapolis." On cross-examination he testified further that before August 16, 1992, his name had always been Charles McLaurin and had never been James Antonio Thorpe.

Defendant asks this court to reverse his convictions because of the State's failure to prove that he was involved with Ingram in the commission of these offenses. Assailing her credibility, he points out correctly that the testimony of an accomplice witness has inherent weaknesses as the testimony of a confessed criminal fraught with dangers of motives such as malice toward the accused, fear, threats, and promises or hopes of leniency or benefits from the prosecution (*People v. Williams*, 147 Ill. 2d 173, 232 (1991)). Because accomplice testimony is attended with serious infirmities, it should be accepted only with utmost caution and suspicion and have the absolute conviction of its truth. *Williams*, 147 Ill. 2d at 233. Nevertheless, while subject to careful scrutiny, the testimony of an accomplice, whether it is corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. *Williams*, 147 Ill. 2d at 233.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that a reasonable doubt of the guilt of the defendant remains. *People v. Smith*, 177 Ill. 2d 53, 73 (1997). Upon a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant. *Smith*, 177 Ill. 2d at 73. Rather, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. *People v. Oaks*, 169 Ill. 2d 409, 457

(1996). In the consideration of a defendant's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Oaks*, 169 Ill. 2d at 457-58.

In the instant case the jury knew of the varying accounts Ingram had given prior to trial concerning the commission of the offenses and of her attempts to conceal her participation in them. The jury was apprised as well of the terms of her plea agreement with the State and the fact that she might serve as few as 10 years for her part in the commission of the murder of Jarrell Edwards. The jury was also instructed that the testimony of an accomplice is subject to suspicion, should be considered with caution, and should be carefully examined in the light of the other evidence in the case.

The other evidence in the case corroborated Ingram's testimony in numerous important details. The condition of Jarrell Edwards' body was in accord with Ingram's description of him as nude except for a scarf wrapped around his face. The condition of his body was also consistent with her description of defendant's slashing him with a razor and pouring gasoline on him prior to setting him on fire while he was still alive: the body bore five incised wounds in the area of the chest, upper abdomen, neck, cheek, and chin that were inflicted before the fire started; the victim died of carbon monoxide intoxication as a result of the inhalation of smoke and, thus, was alive during part of the course of the fire. The burns the victim suffered were consistent with a person's having had gasoline on his body and having then been set afire. Ingram's testimony was consistent with both the location of the victim's body in the bedroom in the burning house and the presence of blood-soaked carpeting in the area where the victim was found lying face down. The

presence in the bedroom of a gasoline can, damaged in conformity with having been in the bedroom during the fire, provided further corroboration of Ingram's account. The discovery after the fire of a surgical glove at the top of the stairs provided still further corroboration of her testimony. Also corroborative of her account was the testimony of the cause and origin investigator of the fire department concerning the location of the fire, its "very fast" nature, which was indicative of a gasoline pour, the smell of gasoline associated with clothes in the room where the victim was found, and the burn patterns and charring, which were, likewise, indicative of the use of a flammable liquid. In addition, all of the four samples of debris tested, including burnt cloth and burnt carpeting, were found to contain the accelerant gasoline.

Nor was Ingram's the only testimony linking defendant to the commission of the offenses. That of Officer Bankston, whom defendant describes as "unworthy of belief," placed defendant behind the wheel of the Edwards' automobile a few hours after the fire. Moreover, defendant's sister Carla discovered two 13-inch televisions and two VCR's on her back porch apparently on the morning of August 16, 1992, within hours after the fire and the theft of two 13-inch televisions and two VCR's from the Edwards' home.

The evidence here is neither so improbable nor so unsatisfactory that a reasonable doubt of the defendant's guilt remains. The jury carried out its responsibility of determining the credibility of the witnesses, resolving the question of the credibility of both Ingram and Bankston, as well as that of defendant, adversely to him. We can but conclude that after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses of which defendant has been convicted beyond a reasonable doubt.

Defendant contends next that his convictions should be reversed and the cause remanded for a new trial because of the trial court's error in holding "that the testimony of several witnesses concerning the mental instability of Delshea Ingram, the alleged eyewitness to the crime, was irrelevant or collateral and in refusing to compel their presence so that the *pro se* defendant could present their testimony to the jury." Defendant argues that the sixth and fourteenth amendments guarantee a defendant the right to establish a witness' bias, interest, or motive to testify falsely, a right the trial court has no discretion to deny him. He maintains that refusing to allow him to present relevant evidence through these six witnesses denied him his right to due process, denied him his sixth amendment right to present a defense, and violated his right under the sixth amendment to compel the presence of witnesses favorable to him. The six witnesses are Gerald Johnson, Regina Davis, Patricia Favors, Zachary Scruggs, Lionel Jones, and Geraldine Patterson.

Following the conclusion of testimony in the State's case-in-chief and outside of the presence of the jury, the trial court asked defendant who his first witness was, whereupon defendant stated that he was "basically seeking a continuance" and explained, "It was just brought to my attention that one of the material witnesses has not been found and the other is deceased. Therefore, I have to implicate additional witnesses and try to, hopefully, come up with a missing witness by Monday. I can't proceed without those people." Then the trial court asked defendant which witnesses he had available that he wished to call "today." During the course of this discussion, the trial court stated,

> "I'm not going to continue this case until Monday. It's now noon and I've given you all week to make sure, and the State has gotten a list of witnesses that you wanted. You did not subpoena these witnesses yourself. I asked you if you had subpoenaed these witnesses.

You are your own attorney. You had not done that. Then I instructed the State to subpoena them for you, and they have done so."

During the discussion of which witnesses were available to testify "today," the prosecutor apprised the trial court, "Everybody the defendant wanted, I gave my best efforts to contact." The prosecutor stated further, "I just met with the defendant again today, Judge, a few moments ago, and he gave me a list of twenty-four names of people that he wants me to contact for him for Monday. I would indicate to the Court that I will do my best to have those twenty-four people here on Monday." The trial court then inquired of defendant which witnesses he wished to call first. Further discussion ensued concerning those witnesses who were available, those who were not, and when the State could make available those who were not. When the defendant announced, "I believe that would be it for—," the trial court stated, "I want the complete list, Mr. McLaurin," explaining, "I want the complete list of witnesses you intend to call. I'm not going to delay the case."

During the discussion about witnesses that followed, the prosecutor stated, "I think the defense has listed a Gerald Johnson and a Christina Johnson from Minneapolis, Minnesota, and he provided us with an address for them which was in Wisconsin, a box number. We sent subpoenas out to Gerald Johnson and Christina Johnson, and we haven't—They have not appeared in court, and we have not been able to locate them. I don't know where they are. We sent subpoenas to the address he gave us." In response to the trial court's question, "What would they testify to, Mr. McLaurin," defendant responded concerning Gerald Johnson, "While Miss Ingram was being interviewed by the Minneapolis Police Department she had implicated Mr. Johnson as far as his having knowledge of this murder. Mr. Johnson would also testify to the state of mind of Miss Ingram as well as other

things." In response to further questioning by the court, defendant indicated that Gerald Johnson would testify concerning Ingram's "credibility for truth or veracity. He would definitely be attacking that." Asked by the court what "specifically" Gerald Johnson would testify to, defendant answered, "He would testify to the fact that Miss Ingram told him that we were not married. He would also testify to the fact that Miss Ingram has various conditions that, at times, affect the way she thinks and reacts." Gerald Johnson would also testify, defendant said, "to the fact that when he met me and Miss Ingram in Minnesota, that we, in fact, had suitcases and belongings with us. He would also testify to the fact that I had other employment in Minnesota under the name of Charles McLaurin." Defendant added, "He would also be able to lend credence as to why I used both names. He would also testify to a situation that cannot be avoided, that would have to be brought out in trial, as to how the names of James Thorpe, in actuality, got carried over into the Public Aid Office, and from there got carried over into the apartment that I lived in." Following the State's objection to the testimony of this witness, the trial court concluded, "Any impeachment he would give would be collateral at best. It's speculative. It's wild speculation as to what he would testify to."

The defendant described Regina Davis as "a long-time friend" with whom he had once lived, who was in possession of some documents he required and could testify concerning one of his residences sometime after 1991. She could testify, he said, "to a particular conversation she had with Miss Ingram to which Miss Davis was planning over the Summer of '93, before we were arrested, to send her child up to Minnesota to spend the summer." Defendant continued,

"Personally she had never met Miss Ingram and she would call to various points to talk with me once it was discovered by Miss Ingram that she was sending her child up there

for the Summer.

Miss Ingram wanted to have conversations with Miss Davis, and from that conversation Miss Davis had inquired of me as to what was wrong with Miss Ingram, and I asked her what did she mean by that, and it had something to do with the entire conversation, from which I have a very strong idea as to what that was about."

Defendant also stated that this witness "would be able to give credible testimony as to one of the main reasons why I do not keep close contact with my family members" and described the reason. Following the State's objection to the testimony of Davis, the trial court stated that it would not permit defendant to call her because her testimony would be speculative and neither relevant nor material.

The defendant described Patricia Favors as "a relative of Miss Ingram who lives in East Chicago, Indiana," who "would be able to give a lot of information as to Miss Ingram's state of mind and her past mental behavior which I mentioned over the time during the pre-trial procedures." Defendant indicated that he had last spoken with Favors from jail after having been extradited to Illinois and had broken off contact with her "because she made a statement concerning Miss Ingram that I thought was kind of cruel for a family member to make." Asked by the trial court what that was, defendant stated,

"Once I brought to her attention Miss Ingram was missing, she stated that well, you know how she is, and I responded, 'What do you mean by that?' And she said, 'You know that if she's with anybody, whoever she's with, she's going to drive them crazy.' She stated that for a reason. I understood that reason."

Defendant stated further that Favors "would be able to give testimony to other situations and Miss Ingram's behavior," adding that Favors "is the aunt who was in custody of Miss Ingram's youngest child." Following the State's objection to the testimony of Favors, the trial

court said that it would not permit defendant to call her because her testimony would be neither relevant nor impeaching.

Of Zachary Scruggs, the prosecutor stated, "[W]e have no idea where he is. We had an address for him in Minneapolis. We tried to find him and we couldn't find him. On the defendant's answer he's given to us he just says 'Zachery [*sic*] Scruggs, unknown; Chicago, Illinois.'" Defendant indicated that Scruggs had moved from Minnesota to Chicago in 1993 and stated that he did not know the address of the witness in Chicago because he had not spoken with Scruggs since defendant's incarceration. Scruggs would, defendant said, testify "that he is the individual who picked me and Miss Ingram up from the bus station in Minnesota, to which he helped us load our baggage. His address is on certain general assistance applications." Scruggs would, defendant stated,

> "testify as to the fact that he had invited me up to Minnesota, as far as looking for a place to stay. I didn't want to stay too close to my family, and he was telling me how it was up in Minnesota, the conditions. He would also testify that I called him back because during the first conversation I had not mentioned Miss Ingram.
>
> I called him back later on that day, after Miss Ingram and I had a conversation, to let him know that I was bringing her with me, because I was actually trying to get her to go stay with her mother, and let me send for her later."

Defendant continued, "He would also testify Miss Ingram and I were supposed to be staying at his place, but prior to us getting there it had come about that he had invited another friend up to Minnesota who had arrived there the day before Miss Ingram and myself. Thus, it became overcrowded and they, in fact, suggested that we go stay in this shelter home." Defendant added,

"When we went to the shelter home they had informed us as to going—As to the goings on in and out of the shelter home and they informed us that there was a dozen or more people from Altgeld Gardens who were staying at the shelter home, and it was also brought to my attention a lot of people from Altgeld Gardens were living in Minnesota, and I wouldn't want to have anything to do with them.

So we sat down at the table for dinner that night and it was brought up that before I signed in at this shelter home, that it would be best for me to use an alias name so these other people would not recognize me, because they had not seen me for a long period of time and I didn't want to be bothered with that particular crowd."

Following the State's objection to the testimony of Scruggs, the trial court concluded that it would not allow him to testify because his testimony "would be collateral at best, regarding the baggage. It's speculative as to his testimony, and his address is unknown, and Mr. McLaurin has stated he has not spoken to Zachery [*sic*] Scruggs since he's left Minnesota."

Of Lionel Jones, for whom no address was listed, defendant said that he would testify that "Miss Ingram stated on that stand that I had not used my real name while in Minnesota, but he would be used to destroy Miss Ingram's credibility on that factor due to the fact that Miss Ingran [*sic*] and myself and he worked for the same temporary agency, to which I was employed under my birth name [of Charles McLaurin]." Defendant said further of this witness' testimony that "[a]ctually his testimony would actually back up Zachery [*sic*] Scruggs' testimony, because he was the individual that had arrived at *** Scrugg's place the day prior to me and Miss Ingram arriving." Following the State's objection to the testimony of Jones, the trial court stated in ruling that it would not permit defendant to call him,

"This is the individual that worked with the defendant up in Minnesota. That impeachment would be collateral. There's no foundation with respect to questioning of

Delshea Ingram with respect to that Delshea Ingram said that he never used the name Charles McLaurin up there. That assumes Delshea Ingram was with him all the time when he worked at other matters or was with other people, and it's not really relevant. It's collateral, so I'm not allowing you to call him."

Concerning Geraldine Patterson defendant stated that he was attempting to obtain from her "certain photographs" of himself from "[t]he year of *** December of '91 through '92." The photographs are relevant, defendant said, "for *** my appearance at that time, compared to the '87 photograph that Officer Bankston was allegedly supposed to identify me from." This witness could also testify, he said, "to Miss Ingram's state of mind" and "her credibility for truth and veracity." Asked how often Patterson had met Ingram, defendant answered, "I believe once or twice" in 1992. Following the State's objection to the testimony of this witness, the trial court concluded, "Photographs are not relevant. There's nothing impeaching about it. They are not material to the issues before this Court. I'm not allowing you to call her."

The right to offer the testimony of witnesses and to compel their attendance, if necessary, is, in plain terms, the right to present a defense. *Washington v. Texas*, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923 (1967). Few rights are more fundamental than the right of an accused to present witnesses in his own defense. *Taylor v. Illinois*, 484 U.S. 400, 408, 98 L. Ed. 2d 798, 810, 108 S. Ct. 646, 652 (1988). Indeed, the right is an essential attribute of the adversary system itself. *Taylor*, 484 U.S. at 408, 98 L. Ed. 2d at 810, 108 S. Ct. at 652. The right to compel the presence of a witness in the courtroom could not protect the integrity of the adversary process if it failed to embrace the right to have the trier of fact hear the testimony of the witness. *Taylor*, 484 U.S. at 409, 98 L. Ed. 2d at 810, 108 S. Ct. at 653.

Thus, the right to offer testimony is grounded in the sixth amendment. *Taylor*, 484 U.S. at 409, 98 L. Ed. 2d at 810, 108 S. Ct. at 653. However, more than the mere absence of testimony is necessary to establish a violation of the right to compulsory process that the sixth amendment guarantees. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 73 L. Ed. 2d 1193, 1202, 102 S. Ct. 3440, 3446 (1982). While the amendment guarantees a criminal defendant compulsory process for obtaining witnesses in his favor, by its terms it does not grant him the right to secure the attendance and testimony of any and all witnesses. *Valenzuela-Bernal*, 458 U.S. at 867, 73 L. Ed. 2d at 1202, 102 S. Ct. at 3446. The defendant must make at least some plausible showing of how the testimony of the witness would have been both material and favorable to his defense. *Valenzuela-Bernal*, 458 U.S. at 867, 73 L. Ed. 2d at 1202, 102 S. Ct. at 3446; *People v. Fryer*, 247 Ill. App. 3d 1051, 1064 (1993). Evidence is material when it tends to raise a reasonable doubt of the defendant's guilt. *People v. Sims*, 167 Ill. 2d 483, 507 (1995). The pertinent inquiry with respect to materiality is not whether the evidence might have helped the defense but whether it is reasonably likely that the evidence would have affected the outcome of the case. *Sims*, 167 Ill. 2d at 507; see *Valenzuela-Bernal*, 458 U.S. at 868-69, 73 L. Ed. 2d at 1203-04, 102 S. Ct. at 3447.

Although defendant has indicated how the testimony of these six witnesses would have been favorable to his defense, he has made no plausible showing of how their testimony would have been material to it. In light of the record before us, the absent testimony defendant described does not tend to raise a reasonable doubt of his guilt. Our examination of the record compels the conclusion that it is not reasonably likely the absent evidence about which defendant complains would have affected the outcome of the case. Thus, defendant has failed to

satisfy the requirement of materiality (see *Valenzuela-Bernal*, 458 U.S. at 867-68, 73 L. Ed. 2d at 1203, 102 S. Ct. at 3446-47) necessary to establish a violation of the right to compulsory process guaranteed by the sixth amendment.

We turn briefly to the third issue defendant raises for our review, which is related to that just addressed. In it he contends that the trial court erred by requiring him to describe the testimony of his witnesses in open court "as a prerequisite for compelling their presence" and by refusing to compel the presence of some of the witnesses. He maintains that the procedure imposed upon him, by which he was required to justify calling his witnesses and his evidence, was arbitrary and violated both due process and his sixth amendment rights to self-representation, to the presentation of a defense, and to compulsory process for obtaining witnesses in his favor. He argues that because witnesses for the State cannot be compelled to reveal their testimony to the defendant, it follows that the defendant cannot be required to reveal, in open court, the content of the testimony of his witnesses as a prerequisite to calling them.

Defendant fails to state that the trial court's request for a description of the testimony he expected from many of his witnesses was precipitated by his own request for a continuance in the middle of trial, a request occasioned, he said, by his very recent discovery that one of the witnesses whom he had intended to call had died and that another had not been found and by his perceived need to call other witnesses to fill the resulting evidentiary void. Eventually, the trial court was called upon to respond not only to the defendant's request for a midtrial continuance but also to the difficulties posed by the inability of the State to locate some of the witnesses defendant wished to call and the defendant's request a day earlier that the State obtain the presence of 24 additional wit-

nesses. Thus, the record refutes the defendant's claim that "[s]olely because [he] represented himself, the court decided that he must justify the presentation of witnesses on his behalf." Although defendant argues that the trial court adopted a procedure that burdened the *pro se* defendant without applying that procedure to the State, which was not required to reveal the testimony of its witnesses prior to examining them, we note that the State did not seek a continuance during trial because of the unavailability of some of its witnesses. Nor can the trial court's questions concerning the testimony of the defendant's witnesses be said to have been arbitrary, arising as they did in the context of defendant's request for a continuance during trial and in response to the difficulties associated with obtaining the presence of a number of the witnesses he sought to call. Under such circumstances, the trial court did not err by asking defendant to describe the anticipated testimony of many of his witnesses. Moreover, in light of our determination that the defendant has failed to satisfy the requirement of materiality necessary to establish a violation of the right to compulsory process guaranteed by the sixth amendment, the trial court did not err by refusing to compel the presence of the six witnesses discussed above.

As the fourth issue defendant raises for our review, he contends that the trial court erred when it allowed the State to impeach him with two felony convictions that were more than 10 years old, in violation of the 10-year limitation set forth in *People v. Montgomery*, 47 Ill. 2d 510 (1971). The guilt phase of defendant's trial was conducted in November of 1995. Admitted into evidence were certified copies of convictions stating that on October 12, 1983, defendant had entered a plea of guilty to the offense of possession of a stolen motor vehicle and that on October 30, 1984, he had entered a plea of guilty to the offense of burglary. The State responds that defen-

dant has waived review of this issue not only by his failure to object but by his repeated assurances to the trial court that he had no objection to the admission of this evidence. In the alternative the State contends that any error was harmless. Defendant argues that where the credibility of both Ingram and Bankston was questionable, had the State not been able to impeach his credibility with these two stale convictions, the jury might have believed his assertions of innocence. However, in light of the evidence adduced against defendant, we agree with the State that error in the admission of the two certified copies of his convictions was, at most, harmless.

As his fifth contention of error, defendant asserts that the trial court "assumed the role of an advocate by asking questions which rehabilitated the credibility of the pathologist who had determined the cause of the decedent's death." Our examination of the record reveals that this contention is entirely without merit.

In the defendant's next, and sixth, claim of error, he contends that he is entitled to a new sentencing hearing because the trial court improperly required him, a *pro se* defendant, "to waive a jury for sentencing in exchange for appointing the public defender to represent him." Defendant argues that his waiver of jury was involuntary because he "was forced to waive a jury as a condition of obtaining the continuance necessary to allow his attorney to develop the mitigation necessary for him to present his defense at the sentencing hearing." After the jury had returned verdicts of guilty, the trial court asked the State, out of the presence of the jury, whether it would be seeking a hearing with respect to the death penalty. Upon receiving an affirmative answer, the trial court asked the defendant whether he wished to have that hearing before the jury or before the court. Defendant responded, "Before the court." Following the trial court's explanation to defendant concerning the two phases of

the sentencing hearing, defendant inquired, "If the jury was to hear the mitigation and aggravation phase, do they vote unanimously or separately on that," whereupon the trial court made clear the requirement of unanimity. At the conclusion of further explanation by the trial court concerning the sentencing proceedings, the court asked defendant, "Do you wish to have this jury sit for these phases or do you wish to waive your right to a jury and have this before the Court?" Defendant answered, "I wish to present it before the jury." The trial court then sent the jury home with instructions to return the next day.

The next morning, outside the presence of the jury, defendant advised the court, "According to the law of eligibility for the death penalty, basically to my knowledge, under that statute, I am eligible for that. Due to that fact I have also read the police reports from past cases and the victim impact statement that would be read to the jury if we get to that point, due to the knowledge of that issue, I elect to have you to preside over it, and waive the jury." The trial court informed defendant, "[E]ven though you say you are eligible, there has to be a finding either by the Court or a jury that you would be eligible. That's the first phase. There would be a hearing with respect to that." After further explanation, the trial court asked defendant whether he wished still to proceed *pro se*, and defendant answered, "Not at this stage, no." The trial court then asked him, "Are you asking that an attorney represent you?" When defendant answered in the affirmative, the trial court stated,

"I am going to appoint the public defender's office to represent you then, and you are going to have to make a determination. I will pass this case for a few minutes for you to speak to the public defender about this, and then we will proceed. Before you elect to either waive or go with the jury, I will appoint the public defender's office for that purpose. Mr. Rago is present in court, has been the standby

counsel throughout these proceedings. I will appoint the public defender's office to represent you.

I will not let the representation, appointment of anyone delay these—well, let me say this: Let me just appoint the public defender and pass the matter for about 15 minutes. I will let you confer with the public defender at this time."

At the conclusion of the recess, the public defender informed the trial court that defendant wished to execute a jury waiver at that time for both phases of the sentencing hearing and tendered to the trial court an executed jury waiver for each. The trial court granted leave to file the jury waivers, questioned and admonished defendant concerning them, and found a knowing, intelligent waiver of jury with respect to both phases of the sentencing hearing. When the trial court asked whether both sides were ready to proceed to the eligibility phase and the public defender stated that he was not because he needed to prepare certain motions, the trial court continued the case for approximately two weeks.

This record does not bear out defendant's contention that he was required to waive a jury during the sentencing hearing in exchange for the appointment of counsel to represent him during those proceedings. Defendant had expressed the wish to be represented by counsel and counsel had been appointed prior to the trial court's statement to defendant indicating that it would not let the appointment delay the proceedings and prior to defendant's execution of the jury waivers. After appointing counsel, the trial court afforded defendant an opportunity to discuss with counsel his announced wish to waive a jury. Defendant's reason or reasons for persisting in his choice of waiver after conferring with counsel are not of record. However, neither defendant nor counsel expressed any concern to the trial court, despite the opportunity to do so prior to tendering the executed jury waivers, that the court had placed defendant in the position of having to waive a jury in order to be effectively

represented by counsel. Upon these facts defendant, nevertheless, concludes that

> "[h]aving heard the court's statement that it would not permit the appointment to delay the proceedings, it is obvious that Mr. McLaurin and his new attorneys decided that they had to waive the jury to obtain a continuance. That is established by the two week continuance obtained by the public defenders immediately after the jury waiver. *** The immediate waiver of the jury, after consultation with the public defenders, is proof that Mr. McLaurin knew that his choice was between a sentencing hearing before a jury with unprepared counsel, or a sentencing hearing before a judge with prepared counsel."

We decline to engage in the speculation defendant proffers.

As his seventh contention of error, defendant maintains that allowing him to represent himself at trial guaranteed his conviction and, therefore, his eligibility for the imposition of a sentence of death under the statutory aggravating factor of felony murder, in violation of the eighth amendment requirement of accurate resolution of capital sentencing issues. Only his shortcomings as a *pro se* litigant, he says, prevented him from successfully countering a weak prosecution case. He asserts that his waiver of the right to counsel ensured that he would be eligible for a death sentence and that the waiver, by automatically qualifying him for a death sentence, compromised the reliability of the capital sentencing proceeding and frustrated society's goal of applying the death penalty rationally. He invites us to reconsider this court's decision in *People v. Silagy*, 101 Ill. 2d 147 (1984), which he describes as holding that the interest of the public in the rational application of the death penalty is subordinate to the right of an individual to represent himself. However, defendant having given us no reason we find persuasive to reconsider the decision in *Silagy*, we decline to do so.

In *Silagy* this court rejected the claim of the defen-

dant that his waiver of counsel during sentencing proceedings should not have been accepted because waiver frustrated the statutory intention to provide the sentencing body with all relevant mitigating evidence and this could best be done by counsel. *Silagy*, 101 Ill. 2d at 179. Similarly, in *People v. Coleman*, 168 Ill. 2d 509, 545 (1995), this court disagreed with the position of the defendant that the demands of increased reliability in the capital setting require that the accused be represented by counsel notwithstanding his own desire to conduct his defense *pro se*. The court stated in *Coleman* that in *Silagy* it had implicitly rejected a distinction between capital and noncapital cases for purposes of the right to self-representation. *Coleman*, 168 Ill. 2d at 546.

As we reiterated in *Silagy*, the right of a defendant to represent himself, when he makes such a choice intelligently, is as basic and fundamental as his right to be represented by counsel. *Silagy*, 101 Ill. 2d at 179. Although a court may consider the defendant's decision unwise, if the decision is made freely, knowingly, and intelligently, it must be accepted out of that respect for the individual that is the lifeblood of the law. *Silagy*, 101 Ill. 2d at 179-80. The instant defendant makes no claim, nor does the record suggest, that his decision to represent himself was made other than freely, knowingly, and intelligently.

Defendant contends next that where the State initially offered him a prison sentence in exchange for a guilty plea and sought a sentence of death only after he refused to plead guilty, the imposition of the death penalty was arbitrary, capricious, and vindictive, thereby violative of the eighth and fourteenth amendments. In a "Motion to Preclude Death," filed on March 22, 1995, prior to trial and prepared by defendant's counsel prior to defendant's representing himself *pro se*, defendant asked the court on the basis of the fourteenth amend-

ment to preclude death because "[a]fter the inception of prosecution, the Office of the State's Attorney on its own had openned [sic] negotiations for the purpose of his obtaining his plea in exchange for a term of years—not death, not natural life." Defendant contended that "[t]o allow the prosecution to seek death or even natural life hereunder is retaliation/revenge for his exercise of his right to a trial" and that "[t]o allow the prosecution to seek death is vendetta to the extreme: the [S]tate first offers him a sentence of a term of years and were he to refuse, then the prosecution seeks his death." Later, prior to the hearing on defendant's eligibility for a sentence of death, defendant filed a motion reiterating these claims. During argument on the latter-filed motion, the assistant State's Attorney said,

"Judge, so the record is clear, on a previous date long before trial there was discussions betwween [sic] Mr. Rago [Assistant Public Defender] and I in regards to a sentence for this defendant. I believe I said something to the effect of if you take sixty years to him, I will see if I can okay it through my supervisor and so forth. Mr. Rago did take that offer to the defendant. Defendant rejected it immediately. Nothing ever came of that. Obviously, the Court realizes that I would have to go up the chain to have my supervisor agree with that."

In denying the motion, the trial court stated that it would not preclude the State from seeking the death penalty because there was no indication of vindictiveness at all and the punishment was statutorily available. Defendant asserts that the trial court erred by refusing to preclude the possibility of a death sentence.

In *People v. Lewis*, 88 Ill. 2d 129, 148-49 (1981), upon which the State relies in part, the defendant contended that the action of the prosecutor in offering to recommend a 60-year sentence if the defendant pled guilty and in seeking the death penalty when defendant elected to stand trial penalized him for exercising his constitutional right to a jury trial. This court found no merit to the

contention in *Lewis*, stating that it was entirely clear that the defendant knew death was a possibility when he chose to stand trial, that there was no indication of a purpose to punish defendant for exercising his right to a jury trial, and that there were no allegations of prosecutorial vindictiveness. The court concluded in *Lewis*, "Unless we are willing to say that a prosecutor may never seek a penalty greater than that offered in plea discussions, defendant's argument here must fail, for his election to stand trial was made with a complete understanding of the hazards." *Lewis*, 88 Ill. 2d at 149.

As the State points out, the record in the instant case reveals that defendant knew death was a possibility when he elected to stand trial. In addition to the motion to preclude death defense counsel filed on March 22, 1995, defendant *pro se* filed on July 14, 1995, a "Motion In Limine—Exclusion of references to possible release of defendant if given sentence less than death." In the latter motion defendant sought an order prohibiting the prosecutor during the course of *voir dire* and trial from making any reference, directly or indirectly, "to the fact that the defendant, if given a sentence less than death could be released at some subsequent point in time" and "to the fact that the defendant was incarcerated previously and after his release he committed further crimes, and that the jury should vote guilty and impose the death sentence to insure that the defendant will not be released upon the public." Defendant listed as grounds in support of the motion, *inter alia*, that he is "being charged with a serious offense that could result in the death penalty." Nor is there in the record any indication of a purpose to punish defendant for exercising his right to a jury trial or prosecutorial vindictiveness of any kind. As did the court in *Lewis*, we conclude that there is no merit to the defendant's contention.

We address next defendant's contention that this

court should vacate the death sentence imposed because the sentencing court relied on an unconstitutionally vague aggravating factor at both stages of the sentencing hearing. The factor to which he refers is that set forth in section 9—1(b)(11) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11)), providing that a statutory aggravating factor sufficient to make a defendant eligible for the death penalty exists if the murder was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means. In *People v. Williams*, 173 Ill. 2d 48, 90 (1996), we pointed out that we had already rejected the argument that the term "cold, calculated and premeditated," as used in section 9—1(b)(11), is unconstitutionally vague. We found in *Williams* that the totality of the words used in section 9—1(b)(11) provides sufficient guidelines for the sentencer in determining eligibility for a death penalty and reaffirmed there our holding in *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993) that section 9—1(b)(11) is constitutionally valid. Because the terms of this section provide sufficient guidelines for the sentencer in determining death eligibility, the need for a limiting instruction, urged by the instant defendant, has been rejected. *People v. Mulero*, 176 Ill. 2d 444, 469 (1997). In *People v. Munson*, 171 Ill. 2d 158, 191-92 (1996), this court rejected the claim, advanced by the defendant here, that the "calculated and premeditated" language of this section is merely another way of describing intent. In its proper context, we said in *Munson*, this particular factor pertains to the intent to murder pursuant to a particular plan, scheme, or design and is not merely the intent to commit murder; hence, this factor is not present in every murder case and does place the necessary restraint on the sentencer's discretion to impose death. *Munson*, 171 Ill. 2d at 191. In reliance on both *Munson* and *Johnson*, this court rejected in *People v.*

*Haynes*, 174 Ill. 2d 204, 255 (1996), the argument, likewise offered by the defendant here, that the terms of this section do not adequately narrow the class of those eligible for death. Defendant having given us no persuasive reason to depart from these holdings, we do not disturb them.

In another issue defendant presents for review, he maintains that the trial court erred at both phases of the sentencing hearing by relying on an aggravating factor that had not been enacted by the legislature at the time of the commission of the offense, namely, the infliction of torture in the case of intentional murder. At the eligibility phase of defendant's sentencing hearing, the State argued that he was eligible for the imposition of a death sentence on this basis, among others. At the conclusion of the hearing on eligibility, the trial court made the following findings: that the defendant had attained the age of 18 years or more; that the victim was, in fact, killed by the defendant in the commission of another felony; and that the defendant had been found guilty by a jury of the offenses of home invasion, residential burglary, aggravated arson, first-degree murder, and first-degree murder based on the felony-murder doctrine. The trial court found further

> "that based on the review of *** the testimony of the facts of this case, that this defendant is eligible for Phase 3, the aggravation and mitigation hearing. This is a cold, calculated and premeditated murder; that the defendant did, in fact, inflict torture involved in this case. There is extreme physical pain, as evidenced by the testimony. The defendant is eligible for Phase No. 3, that being the aggravation and mitigation hearing, and the Court so finds."

At the time of the commission of the offense in August 1992, section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)) provided that a statutory aggravating factor sufficient to make a defendant eligible for the death penalty exists if the

murdered individual was killed in the course of another felony, including aggravated arson, residential burglary, and home invasion. Also at the time of the commission of the offense, section 9—1(b)(11) provided that another statutory aggravating factor sufficient to make a defendant eligible for the death penalty exists if

"the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom."

Thus, the trial court found defendant eligible for the death penalty on the basis of not only the infliction of torture but also two other statutory aggravating factors: felony murder, pursuant to section 9—1(b)(6), and the commission of the murder in a cold, calculated, and premeditated manner, pursuant to section 9—1(b)(11).

A finding of eligibility based upon one statutory factor is not rendered invalid simply because the sentencer relied upon another statutory eligibility factor that is subsequently held to be invalid. *Sims*, 167 Ill. 2d at 523-24. The Illinois death penalty statute places no special emphasis upon any one aggravating factor and accords no special significance to the existence of multiple aggravating factors, as opposed to a single one. *People v. Cole*, 172 Ill. 2d 85, 102-03 (1996). Once one statutory aggravating factor is proved, the defendant is eligible for the death penalty regardless of the existence of other such factors. *People v. Page*, 156 Ill. 2d 258, 269 (1993). Thus, if two or more statutory aggravating factors are found to exist, a defendant remains eligible for the death penalty despite the invalidity of one of them. *Cole*, 172 Ill. 2d at 103. Although the trial court found defendant eligible for the death penalty on the basis of the infliction of torture, which was not a statutory aggravating factor at the time of the commission of the offense, his eligibility for the death penalty is unaffected as long as one of

the two other separate and independent statutory aggravating factors found by the trial court to exist is valid. Inasmuch as the trial court found defendant eligible for the death penalty on the basis of the valid statutory aggravating factor of the commission of the murder in a cold, calculated, and premeditated manner, his eligibility for the death penalty is unaffected by the trial court's further finding of eligibility for the death penalty on the basis of the infliction of torture.

Nor is there merit to defendant's contention that consideration of the improper statutory aggravating factor of the infliction of torture "played a major role in the imposition of the death sentence in this case." He argues that "[t]he trial court said almost nothing when imposing death, but it did describe the crime as a 'horrible, horrible' case, which is an unambiguous reference to the torturous nature of the death." At the conclusion of the aggravation and mitigation phase of the sentencing hearing, the trial court stated that it had listened attentively to the factors presented in the aggravation and mitigation hearing and found that the evidence presented with respect to the defendant's background and past criminal behavior was relevant and reliable. The trial court said further,

> "And I've looked at the facts of this case, the circumstances surrounding this case, the evidence of this case. The—This Court brings to—with it all of its experience. This Judge does not sit in a vacuum. This Judge brings with it myself to the court; all of my life experience; all of the experience that I've had in and around the criminal justice system for almost thirty years.
>
> I have seen hundreds of—of murder cases. I've seen them firsthand as a police detective—a homicide detective for years. I've seen them in the—in the capacity of an attorney both as a State's Attorney and as a Defense attorney. And I have seen them as a Judge. I have seen the horrors of death and war. I have seen the horrors of death in life—in my professional life.

This case is one of the more horrible, horrible cases that I have ever seen. I have looked hard to find—And the responsibility is awesome. I've looked hard to find a factor sufficient to preclude the imposition of the death penalty. And there are none.

This Court finds that there are no factors sufficient to preclude the imposition of the death penalty in this case."

The remarks of the trial court make clear that, in determining that there were no mitigating factors sufficient to preclude the imposition of a death sentence in this case, the court did not rely on the statutory aggravating factor of the infliction of torture. By its own statement, the trial court considered the "facts," "circumstances," and "evidence" pertaining to the case.

As his eleventh contention of error, defendant asserts that the conviction of home invasion must be vacated as a lesser included offense of murder because the murder resulted from the same physical act, that is, starting a fire, that was relied upon to charge him with and to prove the offense of home invasion. He maintains that the consideration of the conviction for home invasion as an aggravating factor violated the eighth and fourteenth amendments.

The jury found defendant guilty of first-degree murder and of first-degree murder based on the felony-murder doctrine. In the first count of the indictment against him he was charged with first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) in that he "without lawful justification intentionally and knowingly started a fire and killed Jarrell Edwards"; in the second count of the indictment he was charged with first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)) in that he "without lawful justification started a fire and killed Jarrell Edwards knowing that starting said fire created a strong probability of death or great bodily harm to Jarrell Edwards"; in the third, fourth, and fifth counts of the indictment he was charged with first-degree mur-

der (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)) in the death of Jarrell Edwards on the basis of the commission of the forcible felonies of home invasion, aggravated arson, and residential burglary, respectively. The order of sentence and commitment to the Illinois Department of Corrections indicates that counts 2, 3, 4, and 5 have been merged into count 1, the count of the indictment alleging intentional murder. We note that where but one person has been murdered, there can be but one conviction for murder (*People v. Mack*, 105 Ill. 2d 103, 136-37 (1984)) and that where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed the most serious offense (*People v. Guest*, 115 Ill. 2d 72, 104 (1986)); when multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense (*Mack*, 105 Ill. 2d at 137).

Home invasion is the act of entering a home and injuring a person or using force or the threat thereof against a person. Ill. Rev. Stat. 1989, ch. 38, par. 12—11; *Johnson*, 154 Ill. 2d at 371. The count of the indictment charging defendant with the offense of home invasion alleges that "he, not being a peace officer acting in the line of duty, entered *** the dwelling place of Jarrell Edwards without authority, knowing that Jarrell Edwards was present and intentionally injured Jarrell Edwards to wit: Charles McLaurin set a fire which caused the death of Jarrell Edwards."

In *People v. Novak*, 163 Ill. 2d 93 (1994), this court reaffirmed its preference for the charging-instrument approach to identifying lesser included offenses. *People v. Hamilton*, 179 Ill. 2d 319, 326-27 (1997); *People v. Jones*, 175 Ill. 2d 126, 135 (1997). According to this approach, an offense is deemed to be a lesser included offense if it is described by the charging instrument. *Hamilton*, 179 Ill. 2d at 324; *Jones*, 175 Ill. 2d at 135. The instrument

charging the greater offense, must, at a minimum, set out the main outline of the lesser offense. *Jones*, 175 Ill. 2d at 135. In the instant case, the indictment charging the greater offense of intentional murder does not set out the main outline of the lesser offense of home invasion. Although the indictment charging the offense of home invasion includes the allegation that defendant intentionally injured the victim, Jarrell Edwards, by setting a fire that caused his death, it includes the further allegation that defendant entered the victim's dwelling without authority, knowing that the victim was present. This latter allegation is absent from the indictment alleging the offense of intentional murder. Because the offense of intentional murder as charged does not describe the offense of home invasion, we conclude that the offense of home invasion of which defendant was convicted is not a lesser included offense of that of intentional murder.

Although defendant argues further that the prohibition of *People v. King*, 66 Ill. 2d 551, 566 (1977), against carving more than one offense from the same physical act is dispositive of this issue, we disagree, bearing in mind that multiple convictions and concurrent sentences are permitted where a defendant has committed several acts, despite the interrelationship of those acts (*King*, 66 Ill. 2d at 566). In support of this argument, defendant asserts that the convictions for intentional murder and home invasion resulted from the same physical act, that is, the setting of the fire. However, the two offenses were not carved from the same physical act of setting the fire where the offense of home invasion involved an additional physical act of entering the dwelling of the victim. Thus, we do not vacate the conviction for the offense of home invasion or the 60-year sentence imposed thereon.

Defendant maintains further that it was improper to

predicate a statutory aggravating factor upon the offense of home invasion in order to determine his eligibility for a sentence of death because "[u]sing the ignition of the fire to establish murder, and then using it as the predicate for home invasion to establish the aggravating factor, constituted double enhancement." However, we need not address this claim because the trial court found defendant eligible for the imposition of a death sentence on the basis of the valid statutory aggravating factor of the commission of the murder in a cold, calculated, and premeditated manner, pursuant to section 9—1(b)(11). Although defendant reasons further that because the trial court found the existence of this aggravating factor at the eligibility stage of his death penalty sentencing hearing, it must have relied upon this factor at the aggravation and mitigation stage of the death penalty sentencing hearing, the record gives no indication that the trial court did so.

As his twelfth contention of error, defendant contends that the conviction for the offense of residential burglary must be vacated because it is predicated upon the same unauthorized entry that established the conviction for the offense of home invasion. As we have already indicated, prejudice results to the defendant in those instances where more than one offense is carved from the same physical act. *King*, 66 Ill. 2d at 566. Here, the offenses of home invasion and residential burglary have been carved from the same physical act of defendant's entering the dwelling of Jarrell Edwards. Therefore, we vacate the conviction for the offense of residential burglary and the sentence of a term of 15 years imposed thereon.

Similarly, in the thirteenth issue defendant presents for our review, he contends that the conviction for the offense of aggravated arson must be vacated because it is based upon the same physical act as is the conviction for

intentional murder, that is, starting a fire. The count of the indictment charging defendant with the offense of aggravated arson alleged that in the course of committing arson he knowingly damaged real property, that is, the Edwards' residence, and he knew or reasonably should have known that one or more persons were present therein. The relevant statute provides that "[a] person commits aggravated arson when in the course of committing arson he knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, and (1) he knows or reasonably should know that one or more persons are present therein ***." Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1. We agree with the defendant that the offenses of both aggravated arson and intentional murder were carved from the same physical act of starting a fire. Thus, we vacate the conviction for the offense of aggravated arson and the sentence of a term of 30 years imposed thereon.

Because the trial court found defendant eligible for the imposition of a death sentence on the basis of the valid statutory aggravating factor of the commission of the murder in a cold, calculated, and premeditated manner, pursuant to section 9—1(b)(11), we do not consider defendant's contentions that the trial court improperly relied upon the convictions for the offenses of residential burglary and aggravated arson in determining his eligibility for the death penalty. Although defendant asserts further that the trial court weighed the convictions for residential burglary and aggravated arson at the aggravation and mitigation stage of the death penalty sentencing hearing, the remarks of the trial court at the conclusion of that stage of the hearing do not suggest that either conviction played a part in its determination that there were no mitigating circumstances sufficient to preclude the imposition of a death sentence. Plainly, in view of the record here, any consideration the trial court might have

given to either of these convictions was, at most, minimal.

Defendant challenges the constitutionality of the Illinois death penalty statute in the final two issues he presents for our review. He maintains that the Illinois death penalty statute is violative of the eighth and fourteenth amendments because it places a burden of proof on the defendant that precludes meaningful consideration of mitigation and allows the sentencer to weigh a vague aggravating factor, namely, any other reason supported by the evidence why the defendant should be sentenced to death. See Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). We have already considered and rejected these arguments (*People v. Thomas*, 178 Ill. 2d 215, 254 (1997); *People v. Taylor*, 166 Ill. 2d 414, 439 (1995)) and address them no further. Finally, defendant contends that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. He acknowledges that this court has considered separately several arguments in support of his position but asks us to reconsider these separate arguments and to consider whether in their totality the features and omissions he sets forth render the statute unconstitutional. Defendant having advanced no new arguments in support of his position, we decline to reconsider the prior holdings of this court concerning the separate constitutional defects he identifies. Moreover, this court has previously rejected the argument defendant proffers concerning the cumulative effect of these features and omissions (*People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989)), and we do not reconsider it.

For the foregoing reasons, defendant's convictions and sentences for the offenses of intentional murder, home invasion, and possession of a stolen motor vehicle are affirmed. Defendant's convictions and sentences for

the offenses of residential burglary and aggravated arson are vacated. The clerk of this court is directed to enter an order setting Thursday, January 14, 1999, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is confined.

<div align="right">

*Convictions and sentences affirmed in part*
*and vacated in part;*
*death sentence affirmed.*