NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200560-U

NO. 4-20-0560

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 26, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cumberland County |
| RICHARD LEE ALBERT, | ) | No. 19CF70 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jonathan T. Braden, |
| | ) | Judge Presiding. |

---

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the trial court's improper
admonishment pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012)
did not constitute plain error because the evidence against defendant was not
closely balanced and (2) defendant's convictions for home invasion and
residential burglary did not violate the one-act, one-crime rule.

¶ 2    Following a September 2020 trial, a jury found defendant, Richard Lee Albert,

guilty of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) and residential burglary (*id.*

§ 19-3(a)). The jury acquitted defendant of battery (*id.* § 12-3(a)(1)). In November 2020, the

trial court sentenced defendant to 28 years' imprisonment for home invasion to run concurrent to

a 10-year prison sentence for residential burglary.

¶ 3    Defendant appeals, arguing (1) the trial court plainly erred in admonishing

potential jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), when it did not ask

every member of the jury whether they understood and accepted each of the principles

enumerated in the rule and (2) his convictions for home invasion and residential burglary, being based upon the same physical act, violate the one-act, one-crime rule. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         In September 2020, the State filed a second amended information charging defendant with (1) home invasion, in that defendant, knowingly and without authority, "entered the dwelling place of another when Defendant knew that one or more persons were present and intentionally caused an injury to a person within the dwelling place" (720 ILCS 5/19-6(a)(2) (West 2018)); (2) residential burglary, in that defendant, knowingly and without authority, "entered within the dwelling place of another with the intent to commit therein a theft" (*id.* § 19-3(a)); and (3) battery (*id.* § 12-3(a)(1)). The charges stemmed from an incident that occurred on February 27, 2019.

¶ 6                              A. Defendant's Jury Trial

¶ 7         In September 2020, during *voir dire*, the trial court and the parties selected the jury out of five separate panels. During the first panel, the court individually read the Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles to each prospective juror. However, the court only asked prospective juror Breer, "Do you accept the Defendant is presumed to be innocent of the charges against him?" The court failed to ask prospective juror Breer if he "understood" the presumption of innocence. After the court finished questioning the first panel, defense counsel asked the prospective jurors to raise their hands if they agreed that defendant was not required to prove his innocence. Ultimately, prospective juror Breer served on the jury.

¶ 8         Subsequently, the trial court indicated for the remaining panels of prospective jurors, it would read the Rule 431(b) principles to the group and then elicit individual responses. The court then proceeded to appropriately examine the second panel. The court next examined

the third panel of prospective jurors. The court read the Rule 431(b) principles to the prospective jurors. However, the court did not give prospective juror Adam or prospective juror Cooper a chance to respond to the question, "Do you understand and accept the Defendant's choice not to testify cannot be held against him?" Ultimately, prospective juror Adam served on the jury, but prospective juror Cooper was excused. The court then examined the fourth and fifth panels of prospective jurors.

¶ 9 Following *voir dire*, the trial commenced. The parties presented the following relevant evidence.

¶ 10 1. *Police Chief Keith Harris*

¶ 11 Keith Harris, the chief of police for Greenup, Illinois, testified he received a report that an incident occurred at Tip Carlen's residence in Greenup around 9 p.m. on February 27, 2019. The next day, February 28, 2019, Chief Harris went to Carlen's residence to investigate the incident. When Chief Harris arrived at Carlen's residence, Chief Harris observed an injury to Carlen's head. The trial court admitted, without objection, a photograph showing a bruise on the top of Carlen's head.

¶ 12 Chief Harris interviewed Carlen, who reported a burglary the night before at his residence. Chief Harris testified Carlen told him the intruder "was wearing all black. He said he had a black hood pulled down, and he said he was wearing some kind of, like a black mask or whatever to conceal his identity up here but it was all black." Chief Harris testified he provided Carlen with a photographic lineup and "He looked at it real close. And his vision is not that good. He just wasn't able to identify the suspect." Chief Harris testified defendant's photograph was in the lineup.

¶ 13        After Chief Harris spoke with Carlen, he obtained a search warrant to search 101 West Cincinnati Street, defendant's residence.  Chief Harris testified that the residence at 101 West Cincinnati Street in Greenup was about a block from Carlen's residence.  Chief Harris stated he knew where defendant lived because on February 17, 2019, about a week before the incident at Carlen's residence, defendant came to see him at the police station to ask him about "burning and cleaning up" at his residence.  Chief Harris testified that on February 17, 2019, when defendant came to the police station, he wore a black jacket and hat.

¶ 14        Chief Harris testified that in executing the search warrant, on February 28, 2019, police were looking for two major items—a Samsung flip phone and a black hoodie.  After searching the residence, police did not find the flip phone or a black hooded sweatshirt.  However, police found methamphetamine and syringes in the residence.

¶ 15        Chief Harris also spoke with defendant on February 28, 2019.  Chief Harris testified defendant denied having any involvement with the incident at Carlen's residence.  Rather, Chief Harris testified defendant provided that on February 27, 2019, he had been using methamphetamine at "the old Albert place[,]" south of Greenup and that he had been with Daniel "Danny" Hires in Mattoon, Illinois. Chief Harris opined that it takes about 30 minutes to drive from Mattoon to Greenup.

¶ 16        Chief Harris further testified that during the incident at Carlen's residence, money was stolen.  When Chief Harris spoke with defendant, defendant had $23 or $24 in his possession but said the money was from selling items and his parents helped him out.  Chief Harris spoke with defendant again on March 1, 2019, at the Cumberland County jail, where defendant again admitted to using methamphetamine and showed his arms where he "shot methamphetamine."

¶ 17        A few days later, Illinois State Police crime scene investigators analyzed the crime scene at Carlen's residence. The investigators processed a metal lockbox the intruder picked up and shook when he entered the residence, but the investigators failed to locate any deoxyribonucleic acid (DNA) or fingerprint evidence at the scene.

¶ 18        In September 2019, Danny Hires contacted Chief Harris and told him that defendant "was contacting him to get with him to try to, to establish an alibi for the night of February 27th, 2019." Chief Harris testified that after Hires approached him about defendant, Harris asked Hires to wear a recording device when he talked to defendant. On October 7, 2019, Chief Harris filed an application for an order authorizing the use of an eavesdropping device, which the trial court subsequently approved. On October 8, 2019, Chief Harris gave Hires the recording device which was disguised as an ink pen. On October 10, 2019, Hires returned the device with two different recordings taken on October 9, 2019.

¶ 19                        2. *Hubert "Tip" Carlen*

¶ 20        Hubert Carlen, the victim, testified he goes by the nickname "Tip" and that he was a World War II veteran who resided at 708 South Mill Street in Greenup for the last 22 years. Carlen testified that on the night of February 27, 2019, he was 99 years old. When asked how his eyesight was in February 2019, Carlen stated, "I can't see too good." Carlen admitted he could see shapes "pretty well" but he could not identify faces too well. As to his hearing, Carlen testified, "Well, if I'm facing the person, I can hear pretty well. But otherwise not so good." However, Carlen stated he could recognize voices.

¶ 21        Carlen testified that around 9 p.m. on February 27, 2019, his doorbell rang or someone knocked on his front door and he answered the door when "this guy in black, all dressed in black, he just barged right in, you know, real quick." Carlen testified the individual,

once inside his residence, stated, "I want all your money." Carlen responded, "What?" The individual responded, "I want all the money you got." Carlen testified he then looked on the kitchen table for his billfold but it was not on the table. Carlen turned to face the individual who then hit Carlen on the top of the head. After the individual hit Carlen, Carlen found some money and gave it to the individual who then fled from the residence. Carlen testified that after the individual left, he could not find his cell phone to call for help nor could he walk to a neighbor's house without the fear of falling.

¶ 22 Carlen testified he believed he had seen the intruder three or four days before the incident on February 27, 2019. About three or four days before February 27, 2019, Carlen's doorbell rang around 9 p.m. Carlen testified he answered the door and a man introduced himself saying, "I'm Richard Albert." After the man introduced himself, he asked Carlen if he "remember[ed] Ines and Chester Albert?" Carlen testified that he told the man he was familiar with Chester and Ines, and Carlen continued to speak with the man, who he described as "friendly." Carlen stated that during the conversation, the man mentioned he recently moved into Richard Hunt's residence and he needed to clean it up because it was messy. Carlen also testified that the man asked him for money, so Carlen gave him $20.

¶ 23 On cross-examination, Carlen admitted he did not know defendant's name until Chief Harris told him following the February 27, 2019, incident. However, on redirect examination, the state's attorney stated, "I'll ask you a different way, Mr. Carlen. As you sit here today, do you remember telling Mr. Harris that Mr. Albert had come to your house prior— [.]" Before, the state's attorney could finish his question, Carlen responded, "Yes."

¶ 24                                         3. *Pamela Kuchera*

¶ 25        Pamela Kuchera, Carlen's neighbor and caretaker, testified that on February 28, 2019, she went over to Carlen's residence and "he was shook up and pretty upset, had a big bruise on his head." Kuchera testified she went over to Carlen's residence because he was not answering his cell phone. Kuchera tried to find Carlen's cell phone but was never able to locate the phone.

¶ 26                                        4. *Daniel Hires*

¶ 27        Daniel Hires testified he had known defendant his whole life and he identified defendant in court. Hires provided that in March 2019, defendant reached out to him about the burglary at Carlen's residence. Hires testified that around the same time, he was charged with attempted murder in an unrelated case, which eventually was amended to aggravated battery with bodily harm. Hires was also charged with a drug related charge in a separate case. Hires admitted to being worried about going to prison because of the charges.

¶ 28        While his charges were pending, Hires reached out to Chief Harris and told him that defendant asked Hires about being an alibi for him on the night of Carlen's burglary. While Hires testified that on February 27, 2019, he was not with defendant, on cross-examination, Hires stated he could have been with defendant at some point that day because defendant was over at his house all the time. Hires also provided that Chief Harris told him the State may look favorably upon him if he wore an overhear device when he spoke with defendant. Hires testified that on October 9, 2019, he used an overhear device in the form of a pen to record conversations with defendant. The trial court admitted into evidence two recordings captured by the overhear device, over objection, and the State played the recordings for the jury.

¶ 29        Hires testified the first recording contained a conversation between him and defendant while they sat inside a vehicle outside his residence. Hires identified his voice and

defendant's voice in the recording. In the recording, Hires asked defendant about "the Tip Carlen thing" because he did not know what to say if he was asked about an alibi. Defendant then gave Hires a detailed rundown of their movements in Mattoon on the day of the Carlen incident. Hires also brought up to defendant the things other people were saying happened to Carlen that night, specifically, his injuries. Defendant told Hires, "If I was going to hurt the old man, I would have hurt the old man." Defendant also described what happened when he went to Carlen's front door on the night of the incident. Hires asked if Carlen tried to resist and defendant responded, "No." Hires also asked defendant whether thousands of dollars were taken from Carlen's house to which defendant responded, "There was $24." The recording ended when the two men exited the vehicle and went inside the residence.

¶ 30　　　　Hires testified the second recording contained a conversation between him and defendant that took place inside of his residence with his girlfriend, Debra Hagood, present. Hires again identified his voice and defendant's voice in the recording. In the recording, Hires said, "Hey, Deb, just so you know, he did not hurt the old man. Tip Carlen didn't get touched one time." In the background you hear someone in agreement say, "No." Hires testified defendant said, "No." Then, Hires told Hagood it was not thousands of dollars taken but rather $24 dollars snatched and gone. Defendant cut in to confirm only $24 was taken and that he bought cereal and milk with the money.

¶ 31　　　　Ultimately, Hires received probation for his aggravated battery with a deadly weapon charge.

¶ 32　　　　　　　　　　　　5. *Debra Hagood*

¶ 33　　　　Debra Hagood, Hires's girlfriend, testified that on October 9, 2019, she was present at Hires's residence when Hires and defendant talked about the Carlen burglary. Hagood

- 8 -

heard defendant say he "didn't hurt the old man." Hagood also testified defendant "said that he only got $24, that he bought milk and cereal."

¶ 34                                6. *Sheriff Steve Maroon*

¶ 35            Steve Maroon, Cumberland County Sheriff, testified that in his capacity as sheriff, he ran the jail. Sheriff Maroon stated inmates could use the telephone "anywhere from 6:00 a.m. to 10:00 p.m. on a daily basis." Sheriff Maroon provided all inmate telephone calls were recorded, except for conversations between inmates and their attorney. Sheriff Maroon also provided inmates were informed that calls were recorded. Sheriff Maroon testified the recorded phone calls are stored, after which the caller can be identified using a personal identification number assigned to each inmate that purchases a phone card.

¶ 36            Sheriff Maroon testified that while defendant was an inmate, he purchased a phone card. The State moved to admit and publish a portion of defendant's telephone call recordings through Sheriff Maroon. The trial court admitted into evidence defendant's jailhouse telephone calls, over objection, and the State played the recordings for the jury. Maroon identified some of the telephone calls on the recordings. Specifically, Sheriff Maroon identified conversations between defendant and an individual identified as "Tyler or TJ." Sheriff Maroon testified TJ's real name was Christopher Sanders. Sheriff Maroon also stated he was able to identify defendant's voice on the telephone calls.

¶ 37                                7. *Christopher Sanders*

¶ 38            Christopher Sanders testified he also goes by the name Tyler Jones or TJ for short. Sanders stated he knew defendant and that he spoke with defendant over the telephone while defendant was in the Cumberland County Safety and Detention Center. The State then played a portion of defendant's jailhouse telephone recordings. After listening to the recording,

Sanders stated he believed his voice was on the recording. Sanders then testified that during the telephone call, defendant talked about being with Sanders in late February. When asked if it was possible for Sanders and defendant to have been together in late February, Sanders responded, "I was in custody in Clark County Jail, sir." Specifically, Sanders stated he was taken into custody on January 18 and released on March 3.

¶ 39         Following Sanders's testimony, the parties entered a stipulation that defendant was not a peace officer.

¶ 40                                        8. *Scott Frye*

¶ 41         Scott Frye testified that on February 27, 2019, he lived in Mattoon at West Park Plaza. Around 2 p.m. on February 27, 2019, Frye went to a residence at 33rd and DeWitt Street, about 8 to 10 blocks from his house. Frye testified he saw defendant at the residence. In the late afternoon or early evening, two friends picked Frye up from the residence and they went back to West Park Plaza. When Frye left the residence at 33rd and DeWitt, defendant was still at the residence. Frye testified that about an hour or so later, defendant came over to his house. Defendant stayed at Frye's house for about two to three hours. When asked what time defendant left his residence, Frye stated, "I would say around 5:00 or 6:00 maybe, somewhere in there. It was not too far before dark." However, Frye could not testify as to defendant's whereabouts after he left his apartment. Frye did not know "with absolute certainty" where defendant was between the hours of 8:30 and 9:30 on the night of February 27, 2019. Frye further testified he never saw defendant drive a vehicle. After Frye testified, the trial court addressed defendant outside the presence of the jury regarding whether defendant wanted to testify. Defendant elected not to testify.

¶ 42                                 9. *Jury Deliberations and Verdict*

¶ 43        A little over 20 minutes after the parties submitted the case to the jury, the jury asked the trial court, "whether or not they can receive a transcript of the telephone communications." The jury did not specify which telephone call communication they were requesting. The court submitted a written response to the jury stating, "There are no transcripts of the telephone calls prepared or available as evidence."

¶ 44        About 10 minutes later, the jury asked a second question. Specifically, the jury "asked another question requesting if they could listen to the audio contained on People's Exhibit 5, which were the recordings of the authorized overhear in this case that's previously been published to the jury." Over defense counsel's objection, the court provided the jury with a laptop computer that contained the recordings. The court also submitted a written response to the jury stating, "You have been provided a laptop computer with the audio files available on the home screen. You are to use the laptop solely for the purpose of listening to the recordings you have requested. You are prohibited from using the device or any other device to conduct any outside research or investigation."

¶ 45        A little over 30 minutes later, the jury asked a third question. Specifically, the jury asked, "May we, the jury, have access to either a transcript or an audio recording of the testimony of Tip Carlen and Pam Kuchera." The trial court granted the request and submitted a written response to the jury stating, "A transcript of the testimony of Hubert "Tip" Carlen and Pam Kuchera will be provided to you within the next hour." The court then provided the transcripts to the jury.

¶ 46        Ultimately, the jury found defendant guilty of home invasion and residential burglary. The jury acquitted defendant of battery.

¶ 47               B. Defendant's Posttrial Motion and Sentencing Hearing

¶ 48    On October 14, 2020, defendant filed a motion for acquittal notwithstanding the verdict. In the motion, defendant argued, "[T]he acquittal for a lesser included offense [(battery)] is an implied or actual acquittal of the greater offense, and that evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt as to the Home Invasion charge and that, accordingly, an order granting acquittal notwithstanding the verdict, as to the Home Invasion charge is compelled in the interest of justice." Following an October 29, 2020, hearing, the trial court denied defendant's motion, stating, "I do not believe that you have any basis in Illinois law or under the United States Constitution to challenge these legally inconsistent verdicts."

¶ 49    At a November 5, 2020, sentencing hearing, the trial court sentenced defendant to 28 years' imprisonment for home invasion to run concurrent to a 10-year prison sentence for residential burglary.

¶ 50    This appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52    On appeal, defendant argues (1) the trial court plainly erred in admonishing potential jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), when it failed to ask every prospective member of the jury whether they understood and accepted each of the four principles enumerated in the rule and (2) his convictions for home invasion and residential burglary, being based upon the same physical act, violate the one-act, one-crime rule. We review both issues in turn.

¶ 53    Defendant failed to raise both issues before the trial court and in a posttrial motion, thus rendering the issues forfeited. *People v. Kitch*, 239 Ill. 2d 452, 460, 942 N.E.2d 1235, 1240 (2011). However, we may consider a forfeited claim where the defendant

demonstrates a plain error occurred.  Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).  To prevail under the plain-error doctrine, a defendant must first demonstrate a clear or obvious error occurred.  *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2003).  If an error occurred, we only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *Id.*

¶ 54                                  A.  Rule 431(b)

¶ 55                            1.  *Clear or Obvious Error*

¶ 56           Defendant argues the trial court committed clear error by failing to properly admonish three potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).  Specifically, defendant contends the court failed to ask one prospective juror if he understood the first legal principle under the rule.  Defendant also contends the court failed to allow two prospective jurors a chance to respond to whether they understood and accepted the fourth legal principle under the rule.  The State argues the trial court's failure to properly admonish three potential jurors pursuant to Rule 431(b) was arguable error or a typical trial mistake rather than a breakdown in the adversarial system.  The State asserts such error is reviewed for an abuse of discretion.  See *People v. Rinehart*, 2012 IL 111719, ¶ 16, 962 N.E.2d 444.  We decline the State's invitation to depart from the analysis traditionally undertaken when determining whether an error occurred pursuant to the plain-error doctrine.

¶ 57           Accordingly, we turn to whether the trial court's failure to properly admonish three prospective jurors pursuant to Rule 431(b) resulted in a clear or obvious error.  See *Piatkowski*, 225 Ill. 2d at 565. We review *de novo* whether the court committed a clear or

- 13 -

obvious error with respect to its compliance with Rule 431(b).  See *People v. Belknap*, 2014 IL 117094, ¶ 41, 23 N.E.3d 325.

¶ 58        Under Rule 431(b),

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."  Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 59        Defendant relies on *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010), in support of his argument.  In *Thompson*, the supreme court found the trial court failed to comply with Rule 431(b), noting it entirely failed to address one of the principles and did not ask the jurors if they both understood and accepted another principle.  *Thompson*, 238 Ill. 2d at 607. The supreme court pointed out that Rule 431(b) requires the trial court to "address each of the enumerated principles" and to determine whether the jurors understood and accepted each of the

principles. *Id.* The court further held the rule required "an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.* Our case is analogous to *Thompson*.

¶ 60 Here, the trial court asked prospective juror Breer, "Do you accept the Defendant is presumed to be innocent of the charges against him?" However, the court failed to ask prospective juror Breer if he "understood" the presumption of innocence Rule 431(b) principle. Further, the court failed to give prospective juror Adam and prospective juror Cooper a chance to respond to the fourth principle, "Do you understand and accept the Defendant's choice not to testify cannot be held against him?" As previously noted, defendant elected not to testify in this matter. Thus, the court's admonishments did not comply with Rule 431(b) and, therefore, constituted clear error. Having found clear error, we turn to whether the error amounted to first-prong plain error. We limit our inquiry to first-prong plain error because defendant makes no argument regarding second-prong plain error.

¶ 61                                  2. *First-Prong Plain Error*

¶ 62 When considering whether a clear error violates the first prong of the plain-error doctrine, "a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. To determine "whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53 (citing *Belknap*, 2014 IL 117094, ¶¶ 52-53). "A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

- 15 -

¶ 63    Defendant argues the evidence is closely balanced and that the trial court's failure to ascertain whether each prospective juror understood and accepted each Rule 431(b) principle before they were selected to serve on the jury threatened to tip the scales of justice against him. Specifically, defendant asserts the evidence is closely balanced when considering the central issue in the case, the identity of the intruder. Defendant asserts (1) no physical evidence linked him to the home invasion and residential burglary, (2) a search of his residence produced nothing that linked him to the home invasion and residential burglary, and (3) Carlen's testimony identifying defendant as the intruder was not conclusive where Carlen disclosed having poor eyesight and hearing. Moreover, defendant asserts the closeness of the evidence is further demonstrated by the jury's three notes requesting additional materials during deliberations.

¶ 64    The State argues the evidence is not closely balanced where (1) Carlen identified defendant as the intruder, (2) defendant made statements to both Hires and Hagood about the incident at Carlen's residence where he admitted taking money but denied hurting Carlen, and (3) defendant asked more than one person to provide an alibi for him on the night of the home invasion and residential burglary at Carlen's residence. We agree with the State.

¶ 65    While police found no DNA or fingerprint evidence at the scene nor any physical evidence—a Samsung flip phone or a black hooded sweatshirt—at defendant's residence that tied him to the incident at Carlen's residence, the record shows defendant admitted to Hires on an overhear device that he was involved in the incident at Carlen's residence and took money from Carlen. The State played two overhear recordings that contained conversations between defendant and Hires about the incident at Carlen's residence in February 2019. Hires identified his voice and defendant's voice in the recordings. Specifically, in the first recording, Hires asked defendant about "the Tip Carlen thing" and defendant disclosed what happened during the

- 16 -

incident at Carlen's residence and that he did not hurt Carlen. Rather, defendant stated he only took $24 from Carlen. In the second recording, defendant again asserted he did not hurt Carlen and only took $24 from him. Hagood corroborated the second recording on the overhear device and Hires's testimony where she admitted being present when Hires and defendant talked about the Carlen burglary. Hagood testified that defendant stated he did not hurt Carlen and that he only took $24.

¶ 66 Further, the record shows defendant asked more than one person to provide an alibi for him on the day of the incident at Carlen's residence. Sanders, also known as TJ, testified defendant called him and asked him if he would say they were together in late February 2019. When asked if it was possible for Sanders and defendant to have been together in late February, Sanders responded, "I was in custody in Clark County Jail, sir." The State also submitted phone records from the Cumberland County Safety and Detention Center to corroborate Sanders's testimony about his conversation with defendant.

¶ 67 Chief Harris testified that when he spoke with defendant about his whereabouts on February 27, 2019, defendant told Chief Harris he had been with Hires in Mattoon. However, Hires told Chief Harris defendant asked him to provide an alibi for him on the night of the incident at Carlen's residence. While Hires testified that on February 27, 2019, he was not with defendant, on cross-examination, Hires stated he could have been with defendant at some point that day because defendant was over at his house all the time. Moreover, in one of the overhear recordings, Hires asked defendant what to say if he was asked about an alibi on the day of the incident at Carlen's residence, and defendant responded with a detailed rundown of their movements in Mattoon on that day. While Frye testified that he saw defendant leave his residence in Mattoon around 5 p.m. or 6 p.m. on February 27, 2019, Frye admitted he could not

testify to defendant's whereabouts after he left his apartment and he did not know "with absolute certainty" where defendant was between the hours of 8:30 and 9:30 on the night of February 27, 2019. Chief Harris testified it takes about 30 minutes to drive from Mattoon to Greenup.

¶ 68    To the extent defendant argues Carlen's testimony was not reliable in identifying him as the intruder, we find Carlen's testimony is still compelling. Chief Harris testified Carlen could not identify defendant in a photographic lineup. Carlen admitted he did not see that well and he could only hear well if he was facing the person. However, Carlen testified he could recognize voices. Carlen identified defendant as the same man who came to his residence and spoke with him a few days before the incident. While it was not clear from Carlen's testimony whether he knew defendant's name or if Chief Harris told him defendant's name, Carlen's testimony that defendant asked for money during the February 27, 2019, incident and he gave him some money is supported by defendant's statements that he only took $24 from Carlen during the incident.

¶ 69    Moreover, we reject defendant's contention that the three questions submitted by the jury during deliberations meant the evidence was close in the minds of the jury. Notwithstanding the notes submitted to the court, we "cannot identify what occurred in the minds of the individual jurors that led them ultimately to reach a consensus." *People v. Johnson*, 408 Ill. App. 3d 157, 173, 945 N.E.2d 610, 624 (2010) (rejecting the "defendant's invitation to conclude the evidence was closely balanced based upon rote speculation about the course of deliberations or the note from the jury").

¶ 70    Evaluating the totality of the evidence and conducting a qualitative, commonsense assessment, we conclude the evidence was not closely balanced. See *Sebby*, 2017 IL 119445, ¶ 53. Defendant's statements on the overhear device were consistent with the testimony of Hires

and Hagood.  Further, both defendant's statements and the testimony of Hires and Hagood established defendant's guilt, which was corroborated by other witness testimony.  Moreover, we cannot conclude that trial court's failure to ascertain whether each prospective juror understood and accepted each Rule 431(b) principle before they were selected to serve on the jury tipped the scales of justice against defendant.  Accordingly, where the evidence in this case was not closely balanced, defendant fails to establish first-prong plain error.  See *Piatkowski*, 225 Ill. 2d at 565.

¶ 71                                B.  One-Act, One-Crime Rule

¶ 72            Last, defendant argues his conviction for residential burglary must be vacated because it was carved from the same physical act as his conviction for home invasion and thus the convictions violate the one-act, one-crime rule.  Defendant acknowledges he forfeited this issue on appeal by not raising it in the trial court or in a posttrial motion but maintains we may review his claim under the plain-error doctrine.  The State does not contest plain-error review but argues defendant's convictions for residential burglary and home invasion do not violate the one-act, one-crime rule where the convictions were not carved from the same physical act because home invasion required the additional physical act of intentionally causing an injury to a person within the dwelling place.

¶ 73            Accordingly, we examine whether a one-act, one-crime violation occurred.  If a one-act, one-crime violation occurred, it is reversible error under the second prong of the plain-error doctrine.  See *People v. Coats*, 2018 IL 121926, ¶ 10, 104 N.E.3d 1102 (citing *People v. Nunez*, 236 Ill. 2d 488, 493, 925 N.E.2d 1083, 1086 (2010)).  "Whether a violation of the rule has occurred is a question of law, which we review *de novo*."  *Id.* ¶ 12.

¶ 74            Illinois courts follow a two-step analysis to determine whether a one-act, one-crime violation has occurred.  *Id.* (citing *People v. Rodriguez*, 169 Ill. 2d 183, 186, 661

N.E.2d 305, 306-07 (1996)). "First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts." *Id.* "The *King* court defined 'act' as 'any overt or outward manifestation which will support a different offense.' " *People v. Price*, 2011 IL App (4th) 100311, ¶ 26, 958 N.E.2d 341 (quoting *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977)). The "one-act, one-crime" doctrine provides that a criminal defendant "may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *Coats*, 2018 IL 121926, ¶ 11 (citing *King*, 66 Ill. 2d at 566). However, "Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts." *King*, 66 Ill. 2d at 566. As explained further in *Rodriguez*, a defendant can be convicted of multiple offenses even when they share a common physical act, as long as there is an additional physical act that can support a separate offense. *Coats*, 2018 IL 121926, ¶ 26 (citing *Rodriguez*, 169 Ill. 2d at 189). "If it is determined that the defendant committed multiple acts, the court then moves to the second step and determines whether any of the offenses are lesser-included offenses." *Id.* ¶ 12.

¶ 75        Courts apply the abstract elements approach to determine whether one charged offense is a lesser-included offense. *People v. Miller*, 238 Ill. 2d 161, 938 N.E.2d 498 (2010). Under the abstract elements approach, we compare the statutory elements of the two offenses. *Id.* at 166. Where every element of one offense is contained in a second offense and the first offense does not contain an element not included in the second offense, the first offense constitutes a lesser-included offense of the second offense. *Id.* "If none of the offenses are lesser-included offenses, then multiple convictions are proper." *Coats*, 2018 IL 121926, ¶ 12.

¶ 76    We first determine whether defendant's conduct consisted of separate acts or a single physical act. Defendant contends his residential burglary conviction was carved from the same physical act as his home invasion conviction because they both were based on the same unauthorized entry into Carlen's residence. In support of his argument that his residential burglary conviction and home invasion conviction are carved from the same physical act in violation of the one-act, one-crime rule, defendant cites *People v. McLaurin*, 184 Ill. 2d 58, 106, 703 N.E.2d 11, 34 (1998).

¶ 77    In *McLaurin*, 184 Ill. 2d at 62-63, a jury found the defendant guilty of several offenses including, *inter alia*, first degree murder, home invasion, aggravated arson, and residential burglary. The defendant's conduct included entering the victim's residence, tying the victim up, and setting the victim on fire. *Id.* at 63-69. On appeal, the defendant asserted several one-act, one-crime violations. *Id.* at 103-07. The supreme court found the defendant's convictions for murder and home invasion could stand because, although the two offenses shared the common act of setting the fire, the additional physical act of unlawfully entering the dwelling of the victim supported the home invasion conviction. *Id.* at 105. However, the court found the defendant's convictions for home invasion and residential burglary had been carved from the same physical act of the defendant's entering the dwelling of the victim and vacated the residential-burglary conviction and sentence. *Id.* at 106. Further, the court found the aggravated arson and murder convictions were carved from the same physical act of starting the fire and vacated the aggravated arson conviction and sentence. *Id.* at 107.

¶ 78    The supreme court in *Coats* further explained the *McLaurin* holding as follows:

"[O]ur rationale is evident from reviewing the defendant's conduct
in relation to *all* of the convictions. Under the circumstances, not

- 21 -

only did the offense of residential burglary share the common act of unlawful entry [with home invasion], there was no additional act that could support a separate offense because the act of setting the fire had already been attributed to the murder conviction. [Citation.] Similarly, the aggravated arson conviction and the murder conviction were both carved from precisely the same physical act of setting the fire, and there was no additional physical act that could support the separate aggravated arson offense. Accordingly, under one-act, one-crime principles, the defendant was properly convicted of two offenses for two separate physical acts—the unlawful entry and the setting of the fire." (Emphasis added.) *Coats*, 2018 IL 121926, ¶ 20.

We find defendant's case is distinguishable from *McLaurin*, where defendant's home invasion conviction included the additional physical act of "intentionally causing an injury to a person within the dwelling place[,]" which could not be attributed to another offense.

¶ 79　　Here, the jury convicted defendant of home invasion where defendant, knowingly and without authority, "entered the dwelling place of another when Defendant knew that one or more persons were present and intentionally caused an injury to a person within the dwelling place." The jury also convicted defendant of residential burglary where defendant, knowingly and without authority, "entered within the dwelling place of another with the intent to commit therein a theft." While defendant's convictions for home invasion and residential burglary shared the same physical act of entering the dwelling place of another, the home invasion offense required the additional physical act of "intentionally caus[ing] an injury to a person within the

dwelling place." Defendant's residential burglary offense did not require the additional physical act of "intentionally caus[ing] an injury to a person within the dwelling place." Therefore, we find defendant's convictions for home invasion and residential burglary were not carved out of a single physical act.

¶ 80    On appeal, defendant makes no argument regarding the second step analysis required after a finding that defendant committed multiple acts. Even so, we note that under the abstract elements approach, residential burglary is not a lesser-included offense of home invasion. Specifically, residential burglary requires that defendant enter the residence with the intent to commit therein a theft, while home invasion does not. Unlike residential burglary, home invasion requires defendant to knowingly enter a dwelling place that he knows or has reason to know someone is present in. Accordingly, we conclude defendant's convictions for both home invasion and residential burglary do not violate the one-act, one-crime rule. Thus, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 81                               III. CONCLUSION

¶ 82    For the reasons stated, we affirm the trial court's judgment.

¶ 83    Affirmed.